**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

-v-

1:25-CR-411 (AJB)

JAEL WATTS and LUIS PINO-COPETE,

Defendants.

Hon. Anthony Brindisi, U.S. District Judge:

**DECISION and ORDER**

## I. INTRODUCTION

The United States of America (the "Government") has obtained a ten-count second superseding indictment that charges defendant Jael Watts ("Watts") with making a false statement (Count One), aggravated identity theft (Count Two), wire fraud (Counts Three through Seven), and of conspiring with her co-defendant and husband Luis Pino-Copete ("Pino-Copete") to commit wire fraud (Count Eight). Dkt. No. 154. The second superseding indictment also charges Watts and Pino-Copete (collectively "defendants") with submitting a false document (Count Nine) and aggravated identity theft (Count Ten). *Id.*

The case is set for a jury trial on Monday, September 14, 2026, at 9:00 a.m. in Utica, New York. Dkt. No. 151. Defendants are detained. Dkt. No. 26 (Watts); *see* Text Minute Entry for 12/29/25 (Pino-Copete). Although defendants initially received Court-appointed counsel, Dkt. No. 12 (Watts); Dkt. No. 76 (Pino-Copete), they have each elected to exercise their constitutional right to proceed *pro se*, and the Court has appointed standby counsel on their behalf. Dkt. No. 31 (Watts); Dkt. No. 111 (Pino-Copete). Standby counsel has been instructed to assist each defendant

in obtaining and reviewing discovery materials and to facilitate the process of filing motions and other documents with the Court. *See, e.g.*, Dkt. Nos. 184, 191.

Before the Court are Watts's request for regular, unsupervised, in-person meetings with Pino-Copete, Dkt. No. 190, and defendants' request for an adjournment of the trial and increased access to discovery materials, *see* Text Minute Entry for 9/9/2026. The Government has opposed defendants' requests. *See id.*; Dkt. No. 195.

## II. BACKGROUND

Upon her arrest, the Government sought Watts's detention based on a risk of non-appearance. *See* Dkt. No. 37 at 6. U.S. Magistrate Judge Daniel J. Stewart promptly held a detention hearing. Dkt. No. 32. There, Judge Stewart reviewed the pre-trial services report, heard from counsel, and concluded that Watts should be released on a combination of conditions that included a $100,000 bond (that could be secured by property of equivalent value) and the surrender of her passport. *Id*. at 5–6. Watts's counsel advised Judge Stewart that her client might be unable to put up the bond even using certain real property she owned in New Jersey, and Judge Stewart adjourned the hearing to give Watts an opportunity to confer with her husband, Pino-Copete, who at that time was *not* in custody (or charged with any offenses). *Id*. at 7–10.

When the detention hearing resumed the next day, Watts's counsel advised Judge Stewart that Watts could not afford the $100,000 bond and was unwilling to put up property she owned in New Jersey as collateral. *See* Dkt. No. 33 at 2–3. After hearing further argument, Judge Stewart opined that he had "a significant concern" about a risk of flight, "especially with her ties outside of the country and her husband's ties outside of the country." *Id*. at 9. Even so, Judge Stewart concluded that he could still set conditions of release, including a reduced bond in the amount of $75,000 and an order to surrender her passport, that would ameliorate those risks. *Id*. at 10–11.

Watts was not released on conditions that day. Watts's counsel soon informed Judge Stewart that she was unable to surrender her client's passport at that time. Dkt. No. 33 at 11. This was so, Watts's counsel explained, because it had not been located. *Id.* Watts's attorney further explained to Judge Stewart that she had been in contact with Watts's husband—Pino-Copete—who claimed that he had been looking for it around the house. *Id.* Judge Stewart instructed Watts's counsel to contact the Court when the release conditions could be satisfied and adjourned the matter. *Id.* Watts was remanded to custody. *Id.* at 11–12.

A little over a week later, with Watts still in custody because of her continued inability to satisfy the release conditions, the Government requested to reopen the detention hearing to reconsider Watts's custody status. Dkt. No. 18. In that letter request, the Government informed Judge Stewart that it had obtained recorded jail calls in which: (1) Watts and her husband, Pino-Copete, made clear that they know where her passport is located; (2) Watts instructed Pino-Copete *not* to surrender the passport; and (3) Watts asked Pino-Copete to look up instructions to remotely erase the contents of a smart phone and computer that had been seized from her by investigators. *Id.*

On August 7, 2025, Judge Stewart held a further detention hearing. Dkt. No. 30. There, the Government informed the Court about the recorded jail calls between Watts and Pino-Copete, which revealed that Watts:

> told her husband to sell the house, sell all the assets, don't hand over her passport, and she also instructed him in some detail about how he could go about remotely wiping or deleting evidence from a phone and laptop that investigators seized as part of a court-authorized search warrant on July 21st.

Dkt. No. 30 at 4. Among other things, the Government further explained that Watts had identified new or different real property—property that she had not disclosed to pre-trial services—that might be posted to satisfy her bond. *Id.* at 6. For her part, Watts's counsel continued to maintain that

her client should be released on conditions. *Id*. at 8–11. Watts's counsel informed Judge Stewart that she had obtained the passport and that her client was willing to surrender it at that time. *Id*.

Judge Stewart remarked that this "is a difficult case." Dkt. No. 30 at 11. Judge Stewart explained that he had listened to the recorded jail calls and agreed with the Government's characterization of them: "that her and her husband both knew where the passports were in the kitchen" and that the two discussed "essentially destroying evidence" and planned to move assets out of the country. *Id*. at 11–12. Although he recognized that Watts had no criminal history and the alleged offenses were nonviolent, Judge Stewart observed that, in his experience, he had never dealt with "this type of deception to the Court at all." *Id*. at 12. Ultimately, Judge Stewart decided to adjourn the proceeding to permit the parties to further brief the matter. *Id*. at 17.

The parties did so. Watts, for her part, maintained that Judge Stewart could set conditions of release that would adequately mitigate the risk of non-appearance. Dkt. No. 22. In her briefing, Watts's counsel argued that the recorded jail calls could be explained away for several reasons, including the fact that Watts was newly in custody and her actions were motivated by concern for her husband's well-being. *Id*. In Watts's counsel's view, those recorded calls demonstrated that Watts deeply valued her home in New Jersey. *Id*. Thus, Watts's counsel argued that the fact that Watts was finally prepared to put up one of her properties demonstrated that she would not risk future non-appearances or flight. *Id*. According to Watts's counsel, her client did not have "strong ties to a foreign country" because her only ties to Colombia were through her husband, Pino-Copete, who had been working to obtain legal permanent residence status in the United States. *Id*.

The Government opposed release on conditions. Dkt. No. 25. As before, the Government maintained that Watts's ties to a foreign country and statements she made in furtherance of the alleged fraud scheme indicated that, despite her contrary representations, she holds at least one

foreign bank account. *Id*. The Government further represented to Judge Stewart that more damaging information had come to light: Watts had also failed to disclose to pre-trial services that she had previously used one of her New Jersey properties as collateral to obtain a loan from a private lender. *Id*. The Government reiterated that the recorded calls "demonstrate her contempt for the law" and "provide cause to be seriously concerned that [Pino-Copete] is involved in or aware of her fraudulent scheme, providing further incentive for both of them to flee." *Id*. In addition, the Government's brief included a series of WhatsApp messages exchanged between Watts and Pino-Copete that "demonstrates his complicity in the scheme." *Id*. According to the Government, these text messages and the other proffered evidence demonstrated "that the defendant is a deceptive person who would not abide by release conditions." *Id*.

On August 15, 2025, Judge Stewart resumed the detention hearing one final time. Dkt. No. 34. After hearing argument from the parties, Judge Stewart ordered Watts detained, concluding that the Government had established that Watts was a risk of flight and that no conditions of release could reasonably mitigate that risk. *Id*. at 11–12; Dkt. No. 26. Watts appealed the detention order to this Court, Dkt. No. 28, which affirmed Judge Stewart's decision. Dkt. No. 45. Watts took a further appeal of the detention order, Dkt. No. 53, but a panel of the U.S. Court of Appeals for the Second Circuit eventually rejected her arguments and affirmed. Dkt. No. 129.

In the meantime, Watts sought to proceed *pro se*. *See* Dkt. Nos. 27, 36. Judge Stewart held a representation hearing, relieved Watts's counsel, granted Watts's request, and appointed standby counsel on her behalf. *See* Text Minute Entry for 9/2/25; Dkt. No. 31. Pino-Copete, who was later arrested and ordered detained, also sought to proceed *pro se*. Dkt. Nos. 107, 108. Judge Stewart held a hearing, relieved Pino-Copete's counsel, granted Pino-Copete's request, and appointed standby counsel on his behalf. *See* Text Minute Entry for 3/10/26; Dkt. No. 111.

Throughout her pretrial detention, Watts has repeatedly moved for release from custody, citing health concerns and difficulties accessing discovery. *See, e.g.*, Dkt. No. 51 (citing health concerns); Dkt. No. 60 (same); Dkt. No. 90 (denying relief for same); Dkt. No. 91 (citing health concerns and discovery access); Dkt. No. 128 (denying release based on claimed health concerns and discovery access); Dkt. No. 131 (citing medical treatment and discovery access).

These requests for relief have been denied because, on each occasion, a review of the available record has revealed that: (1) her medical conditions were stable; (2) when necessary, she had received adequate treatment from medical staff at the pre-trial detention facility; and (3) when properly requested, Watts's detention facility had provided adequate and regular access to discovery materials. *See, e.g.*, Dkt. No. 51, 104, 124-1, 128.

On June 29, 2026, the Court held an in-person conference to review the status of the case and set a firm trial date. *See* Text Minute Entry for 6/29/26. At that time, the Court cautioned Watts and Pino-Copete that attorneys with federal law experience would be best suited to represent them and offered to appoint counsel on their behalf. *Id*. Both defendants declined. *Id*. Among other things, Watts again claimed that she was unable to view certain discovery materials at the pre-trial detention facility. *Id*. In response, the Government again represented that it had provided both defendants "with all discovery material except for the review of the contents on both of the Defendants' cell phones/electronic devices." *Id*. The Government further represented that it would "make those items available for viewing in their office." *Id*.

On August 20, 2026, Watts filed another letter in which she asserted that she is being deprived of her "Due Process right to effective communication with [her] co-defendant," and of her "6th Amendment right to plan a unified and coordinated defense." Dkt. No. 162 at 2. As a remedy for these alleged violations, Watts sought "immediate, private, regular opportunities . . .

to confer in person with [Pino-Copete] for trial preparation purposes." *Id*. In response, the Government agreed that defendants "may be permitted to jointly plan their defenses," but maintained that "any rights that such planning encompasses do not extend to private in-person meetings where video conferences would allow for adequate coordination." Dkt. No. 181.

On August 27, 2026, after reviewing the parties' submissions, the Court granted Watts's letter request in part. Dkt. No. 184. As relevant here, the Court explained that:

> Where, as here, pro se co-defendants have been ordered detained pre-trial, any such right or privilege to confer and prepare a joint defense must yield to reasonable, rational safety considerations, such as correctional facility regulatory restrictions that might preclude in-person meetings. In this case, the Court contacted standby counsel for each defendant seeking their availability to schedule a virtual meeting with both defendants outside the presence of the Government's attorneys using Court-provided kiosk systems in the Albany and Rensselaer County Correctional Facilities. A meeting with defendants and their respective standby counsel has been scheduled for Monday, August 31, 2026, at 3:30 p.m.
>
> The purpose of this meeting is to provide standby counsel the opportunity to share their video screen to facilitate the review of any discovery documents that defendant Watts has indicated that she has had trouble reviewing in her most recent letter. If defendants so choose, this meeting shall also provide defendants an opportunity to confer about a joint defense. However, pursuant to the terms and conditions of the Court's kiosk systems, standby counsel must remain on the call with the defendants until completion.

Dkt. No. 184 (paragraph breaks added).

At that time, the Court directed standby counsel to "alert the Courtroom Deputy if defendants desire further opportunities to engage in a video call, whether to further review discovery materials or confer about a defense." Dkt. No. 184. No such requests have been received.

Instead, Watts has filed another letter in which she argues that the virtual arrangement the Court facilitated was insufficient to protect her alleged rights. Dkt. No. 190. Watts's letter includes a renewed request for regular, private, in-person meetings with Pino-Copete. Dkt. No. 190. The Government has opposed. Dkt. No. 195. After reviewing the submissions, and considering

the available record, the Court ordered the Government to supplement the record with an affidavit from an individual with personal knowledge as to:

> (1) the security concerns raised by an unsupervised meeting between two incarcerated individuals from different facilities; (2) the protocol for arranging such a meeting, or if not the lack of such a protocol; (3) a brief description of the kiosks, including their location and general surroundings; (4) whether the kiosks are outfitted with monitoring equipment; (5) whether the kiosks are used routinely for confidential attorney-client meetings; (6) whether others are present with defendants in the kiosks during their use; and (7) a brief description of the videoconferencing platform available on the kiosks, including its general functionality and whether the platform allows for remote screensharing.

Dkt. No. 198.

In the meantime, the Court held a final pre-trial conference on September 9, 2026. *See* Text Minute Entry for 9/9/2026. There, Watts renewed her request for private, in-person meetings with Pino-Copete and made two additional requests: (1) for a one-to-two-week adjournment of the trial to allow her sufficient time to review discovery; and (2) for increased access to discovery materials during the requested adjournment period. *Id.* In support of her new requests, Watts represented to the Court that her pre-trial detention facility had restricted her access to discovery materials. *Id.* Pino-Copete joined in Watts's requests, echoing similar concerns regarding his ability to access discovery materials while detained. *Id.*

The Government opposed adjournment and maintained that defendants have had ample time to review discovery, citing detention facility records indicating that Watts had turned down the opportunity to review discovery materials on at least one occasion. *See* Text Minute Entry for 9/9/2026; Dkt. No. 185-2.

Given the disparities between defendants' representations and the evidence identified by the Government, the Court ordered the Government to supplement the record with affidavits from detention facility personnel elaborating on defendants' opportunity to access and review discovery materials at their respective pre-trial detention facilities. *Id.* Thereafter, the Government

submitted documentation from defendants' pre-trial detention facilities regarding defendants' access to discovery. Dkt. Nos. 207-1, 207-2.

## III. DISCUSSION

Upon consideration of the parties' arguments and review of the submissions, the Court will address all of defendants' trial-readiness-related requests—*i.e.*, Watts's request for private, in-person meetings with her co-defendant, and defendant's requests for an adjournment and increased access to discovery—together.

### A. Unsupervised, In-Person Co-Defendant Meetings

Watts has renewed her request for regular, unsupervised, in-person meetings with Pino-Copete to review discovery and prepare their defense in advance of trial. Dkt. No. 190. She argues that the relief that she and Pino-Copete have received so far, *i.e.*, private, virtual meetings between herself and Pino-Copete in the presence of standby counsel, is insufficient to protect her constitutional rights and does not allow her to review discovery materials in an efficient manner. Dkt. No. 190 at 1–2. In opposition, the Government maintains that defendants' "standby counsel are appropriately included on the calls," and that "Watts and Pino-Copete remain free to review discovery on their own and take notes on it for use in joint discussions." Dkt. No. 195 at 1.

Broadly construed, Watts's letter request identifies three general areas of possible infringement: (1) constitutional deprivations; (2) confidentiality concerns; and (3) issues of convenience. The Court addresses each in turn.

#### 1. Constitutional Deprivations

Watts contends that the denial of private, in-person meetings with her co-defendant (who is detained at a different pre-trial facility) has deprived her of various constitutional rights. Dkt. No. 162. She identifies those rights as her "Due Process right to effective communication with [her] co-defendant, who is also self-represented," and her "6th Amendment right to plan a unified

and coordinated defense." *Id.* at 1 (citing *Perkins v. Wagner*, 513 F. Supp. 904, 906 (E.D. Pa. 1981); *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001)).

The U.S. Constitution affords a host of procedural and substantive rights to an individual charged with a crime. Among these are the right to self-representation, *Faretta v. California*, 422 U.S. 806, 819 (1975), and the right to present a complete defense, *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).[1] Watts has not identified any controlling authority for the proposition that unsupervised, in-person meetings between detained co-defendants are among these rights.

Accordingly, the Court will examine whether the remedial measures it has ordered, *e.g.*, virtual meetings between Watts and Pino-Copete facilitated by, and in the presence of, Court-appointed standby counsel, has deprived defendants of any of their recognized rights.

**i. Right to Self-Representation**

As noted *supra*, defendants have invoked the right to represent themselves. *See* Dkt. No. 36 (Watts); Dkt. No. 107 (Pino-Copete). Relatedly, the Court has appointed standby counsel to assist both defendants. *See* Dkt. No. 31 (Watts); Dkt. No. 111 (Pino-Copete). According to Watts, the presence of standby counsel during their virtual meetings interferes with her and her co-defendant's ability to prepare for trial and plan their joint defense. Dkt. No. 190 at 1.

The Sixth Amendment provides that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . , and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory

---

[1] The Second Circuit has also recognized the right of access to the courts. *See Benjamin*, 264 F.3d at 185; *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004). "The right of access to the courts requires that prisoners defending against criminal charges or convictions. . . not be impeded from presenting those defenses and claims for formal adjudication by a court." *Bourdon*, 386 F.3d at 96. "[T]he appointment of counsel can be a valid means of fully satisfying [the] constitutional obligation to provide prisoners, including pretrial detainees, with access to the courts in conformity with the requirements of the Due Process Clauses of the Fifth and Fourteenth Amendments and the Equal Protection Clause of the Fourteenth Amendment." *Bourdon*, 386 F.3d at 94. Because the Court has appointed standby counsel to assist defendants, *see* Dkt. Nos. 31, 111, the constitutional obligation to provide access to the courts has been satisfied.

> process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI. "This language 'does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.'" *United States v. Barnes*, 693 F.3d 261, 270 (2d Cir. 2012) (quoting *Faretta v. California*, 422 U.S. 806, 819 (1975)).

"A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard." *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984). "[T]he *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *Id.*

But "the right to self-representation is not without limits." *Clark v. Perez*, 510 F.3d 382, 395 (2d Cir. 2008). For instance, "a judge may qualify it by appointing stand-by counsel, with or without the defendant's consent, to 'aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.'" *Id*. at 395 (quoting *Faretta*, 422 U.S. at 834 n.46); *see also McKaskle*, 465 U.S. at 188 (noting that even where a *pro se* defendant declines assistance, standby counsel "need not be excluded altogether, especially when the participation is outside the presence of the jury").

The Supreme Court has acknowledged that "the objectives underlying the right to proceed *pro se* may be undermined by unsolicited and excessively intrusive participation by standby counsel." *McKaskle*, 465 U.S. at 177. Accordingly, the right to self-representation requires "some limits on the extent of standby counsel's unsolicited participation." *Id.* To that end, the Supreme Court has recognized two major limitations on the participation of standby counsel in criminal proceedings:

> (1) the defendant has the right to preserve actual control over the content of the case presented to the jury, and so standby counsel is not allowed to "make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance"; and (2) standby counsel's participation must not be allowed to destroy the jury's perception that the *pro se* defendant is representing herself.

*Clark*, 510 F.3d at 395 (quoting *McKaskle*, 465 U.S. at 178–79).

As relevant here, "[p]articipation by standby counsel outside the presence of the jury engages only the first of these two limitations," *McKaskle*, 465 U.S. at 179, and Watts has not alleged that the presence of standby counsel during her virtual meetings with Pino-Copete has violated this limitation. *See generally* Dkt. No. 190. For instance, she has never claimed that standby counsel for either defendant has attempted to take actual control over the contents of the case during these meetings.

Nor could she plausibly do so. Standby counsel has been tasked to perform an important service in aid of each co-defendant's defense: to help facilitate review of discovery materials between co-defendants, which are voluminous and therefore presented in an electronic format. The fact that Watts may prefer another arrangement does not mean that her right to self-representation has been infringed. Accordingly, Watts has failed to allege that the presence of standby counsel during her meetings with Pino-Copete has impeded her right to self-representation under the Sixth Amendment.

**ii. Right to Present a Complete Defense**

Watts also argues that her inability to meet with her co-defendant privately has impaired her right to prepare and present a joint defense. Dkt. Nos. 162, 190.

"[T]he constitutional source of the right to present a complete defense "is somewhat unclear, [but] its existence is well established." *Williams v. Lord*, 996 F.2d 1481, 1483 (2d Cir. 1993). "As the Supreme Court explained: 'Whether rooted directly in the Due Process Clause of

the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Id.* (quoting *Crane,* 476 U.S. at 690).

"Of course, the right to present a defense 'is not absolute, and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Williams*, 996 F.2d at 1483 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). "Such restrictions, however, may not be 'arbitrary or disproportionate to the purposes they are designed to serve.'" *Williams*, 996 F.2d at 1483 (quoting *Rock v. Arkansas,* 483 U.S. 44, 55–56 (1987)).

Again, Watts has not identified any controlling authority for the proposition that the right to present a defense includes the right to regular, unsupervised, in-person meetings between detained co-defendants. But even assuming that such a right exists, the requirement that standby counsel be present at meetings between co-defendants, who are detained at separate pre-trial facilities, is neither an arbitrary nor a disproportionate restriction on that right.

In *United States v. Gonzalez*, 2018 WL 2186406, at *3 (E.D.N.Y. May 11, 2018), a trial court rejected a similar argument. There, two co-defendants were arrested and kept separated from each other at the request of the Government. *Id*. at *1. One co-defendant moved to lift the separation order that prohibited him from meeting with his co-defendant outside the presence of counsel. *Id*. He argued that his and his co-defendant's "'Sixth Amendment right . . . to prepare their defense, including by consulting alone with a co-defendant' [wa]s jeopardized by the separation order." *Id.* at *3.

The trial court rejected that challenge. *Gonzalez*, 2018 WL 2186406, at *3. In doing so, the court emphasized that the separation order "only prevented the [d]efendants from communicating with each other outside the presence of counsel." *Id.* The court pointed out that the

defendants had failed "to identify any evidence or offer any arguments regarding how prohibiting unsupervised communications between the [d]efendants [might] prevent them from preparing for trial." *Id.* Importantly, the court noted that the co-defendants remained "free to arrange joint defense meetings in the presence of their counsel, and [that] district courts have found such a provision in a separation order avoids any Sixth Amendment concerns." *Id.*

That rationale applies with equal force here. Nothing about the Court's order requiring standby counsel's presence prevents Watts and Pino-Copete from conferring with one another to plan a joint defense. The Court's earlier order granted Watts's request for meetings with her co-defendant, arranged for co-defendants meet virtually, and explicitly indicated that additional meetings would be arranged upon defendants' request. Dkt. No. 184.

Notably, this approach also responds to Watts's *other* concern: access to discovery. If anything, Watts's ability to confer and prepare with her co-defendant is improved by the fact that standby counsel can facilitate review of discovery documents. In sum, absent any plausible allegation that Watts has been meaningfully impeded from communicating with her co-defendant, she has not explained how the current arrangement deprives her of the ability to prepare her defense.

The fact that Watts's meetings with Pino-Copete are virtual, rather than in-person, does not alter this conclusion. *See, e.g.*, *United States v. Kelly*, 2019 WL 1772433, at *1 (S.D. Ga. Apr. 23, 2019) (recognizing that *pro se* co-defendants "'must be allowed to control the organization and content of [their] own defense,'" but finding that "[the] Defendants ha[d] not shown that such a right includes the right to meet in person with one's co-defendants" (quoting *McKaskle*, 465 U.S. at 174)).

The Supreme Court has recognized, in various contexts, that the constitutional rights of pretrial detainees may be subject to reasonable, evidence-based restrictions based on "institutional

needs and objectives." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). For instance, the need to "maintain[] institutional security and preserv[e] internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id*. Courts have held that these limitations may relate to the time, place, and manner of meetings between co-defendants. *See United States v. Coupez*, 603 F.2d 1347, 1351 (9th Cir. 1979) (finding no constitutional violation where trial court's "decisions as to the time, place, and number of the joint conferences [between *pro se* defendants] were, in part, dictated by valid security considerations").

The affidavit submitted by Supervisory Deputy United States Marshal David Tobian ("U.S. Marshal Tobian") demonstrates the multitude of security concerns raised by an unsupervised meeting between co-defendants incarcerated at different facilities. *See* Dkt. No. 199 ¶¶ 2(1)–(2). Given the absence of an established protocol for arranging in person meetings between individuals housed at different facilities, *see id.*, and the availability of reasonable, functional, and fully adequate alternatives, *i.e.*, videoconferencing, the Court finds that defendants' right to confer and plan their defense has not been unconstitutionally restricted by the denial of unsupervised in-person meetings.

**2. Confidentiality Concerns**

Next, Watts's filing appears to raise concerns over her ability to protect the confidentiality of her discussions with her co-defendant under the arrangement provided by the Court. *See* Dkt. No. 190 at 1. Specifically, Watts claims that her conversations take place "in a room outfitted with multiple recording devices," "within earshot of third parties," and that "the forced presence of stand-by counsel at this meeting has no conceivable purpose other than the active monitoring of the codefendant's communications and deliberative process." *Id.*

As an initial matter, there is no indication in the available record the Government has any intent to obtain or use such conversations against defendants. But in any case, Watts has not identified any evidence to suggest that her conversations with Pino-Copete are at risk of disclosure.

First, there is no plausible indication in the record that Court kiosks are outfitted with any recording devices. *See* Dkt. No. 199 ¶ 2(5). Court kiosks have been supplied to various correctional facilities to facilitate private, secure communications between federal detainees and their attorneys—communications which, of course, are privileged. *Cf. United States v. DeFonte*, 441 F.3d 92, 95 (2d Cir. 2006) (finding that journal containing memorialized private conversations between detained defendant and her attorney was protected from disclosure by the attorney-client privilege).

Second, aside from defendants' standby counsel, both of whom are bound by a duty of confidentiality, there is no indication that defendants' conversations occur "within earshot of third parties." *See* Dkt. No. 199 ¶¶ 2(3), (6) (explaining that incarcerated individuals are alone in Court kiosk rooms).

Further, even assuming that third parties, such as corrections officers at the facilities, could somehow ascertain the contents of defendants' discussions without their consent, the work-product doctrine would likely prevent the disclosure of those discussions to the Government.

"The work-product doctrine . . . reflects the strong 'public policy underlying the orderly prosecution and defense of legal claims.'" *United States v. Nobles*, 422 U.S. 225, 236–37 (1975) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)). "The logic behind the work product doctrine is that opposing counsel should not enjoy free access to an attorney's thought processes." *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234 (2d Cir. 1993). "An attorney's protected thought

processes include preparing legal theories, planning litigation strategies and trial tactics, and sifting through information." *Id.*

"Although the doctrine is most frequently asserted as a bar to discovery in civil litigation, the Supreme Court has characterized its 'role in assuring the proper functioning of the criminal justice system' as 'even more vital.'" *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003) (quoting *Nobles*, 422 U.S. at 238). "The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case." *Nobles*, 422 U.S. at 238.

Indeed, Federal Rule of Criminal Procedure 16(b)(2) has explicitly extended the work product doctrine to include a criminal defendant's work product. Fed. R. Crim. P. 16(b)(2). That rule provides that:

> Except for scientific or medical reports, Rule 16(b)(1) does not authorize discovery or inspection of:
>
> (A) reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense; or
>
> (B) a statement made to the defendant, or the defendant's attorney or agent, by:
>
> > (i) the defendant;
> >
> > (ii) a government or defense witness; or
> >
> > (iii) a prospective government or defense witness.

Fed. R. Crim. P. 16(b)(2).

Of course, "[t]he privilege derived from the work-product doctrine is not absolute." *Nobles*, 422 U.S. at 239. And "[l]ike other qualified privileges, it may be waived." *Id.* For example, "[a] party waives the work product protection by taking actions inconsistent with . . . its purpose." *Am. Oversight v. United States Dep't of Just.*, 45 F.4th 579, 593 (2d Cir. 2022) (internal quotation

marks omitted). "Actions inconsistent with this purpose can include the 'disclos[ure of] work product,' whether to the public at large or to an actual or anticipated litigation 'adversary.'" *Id.* (internal quotations omitted).

There is no indication in the available record that defendants have taken any action to disclose their tangible work product or protected thought processes to their adversaries or to the public at large. Accordingly, to the extent a record on this issue must be made, the contents of defendants' strategic meetings remain protected work product and, as such, are not generally subject to disclosure.[2]

**3. Convenience Issues**

Finally, Watts contends that she and Pino-Copete "are unable to confer over discovery material through the video conference platform," and that "there is no opportunity for joint review of the considerable amount of information pertinent to this matter." Dkt. No. 190 at 1.

This contention is unsupported by the available record and, in any event, insufficient to justify the requested relief. First off, standby counsel for Pino-Copete has represented to the Court that he and Watts's standby counsel were willing and able to share their screens during their videoconference with defendants, but that defendants declined their offers. *See* Text Minute Entry for 9/9/2026.

But even setting that aside, by electing to represent themselves, defendants have relinquished "many of the traditional benefits associated with the right to counsel." *Faretta*, 422 U.S. at 835. And in addition to the disadvantages of self-representation, defendants' pre-trial detention implicates some reasonable, evidence-based security limitations. *See Williams*, 996 F.2d at 1483.

[2] In the absence of waiver, a party may only obtain otherwise protected opinion work product upon "a highly persuasive showing [of need]." *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2d Cir. 2000) (internal quotations omitted). No such showing has been made, here.

Per the affidavit of U.S. Marshal Tobian, "[t]here are several [U.S. Marshal Service] policies that prohibit . . . confidential meeting[s]" between "male and female [detainees] in the . . . cellblock or courthouse." Dkt. No. 199 at ¶ 2(1). Those policies have been implemented "due to numerous security concerns, including escape risks that are heightened with two inmates able to work together." *Id.* Defendants have been detained pre-trial as flight risks. Consequently, they are not entitled to private, in-person meetings on convenience grounds.

**B. Adjournment and Access to Discovery**

Next, Watts and Pino Copete have asked the Court to adjourn the trial for one to two weeks to allow them to review the expansive discovery they have received from the Government. *See* Text Minute Entry for 9/9/2026. The Government opposes adjournment, arguing that defendants have had ample time and opportunity to review discovery materials. *Id.*

"The matter of whether or not to adjourn a trial date 'is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel.'" *United States v. Scopo*, 861 F.2d 339, 344 (2d Cir. 1988) (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589 (1964)); *see also United States v. Beverly*, 5 F.3d 633, 641 (2d Cir. 1993) ("A trial judge has broad discretion in regulating the timetable for trial.").

As an initial matter, throughout these proceedings defendants have insisted on a speedy trial: they have opposed the Government's requests for a continuance and for the exclusion time from the statutory speedy trial clock. *See* Dkt. Nos. 138 (Watts), 141 (Pino-Copete). On that point, defendants have maintained that "[t]he instant matter has never been complex." Dkt. No. 138 at 3; Dkt. No. 141 ("This matter has been improperly designated as complex.").

But now, on the eve of trial, defendants urge the Court to grant an adjournment, citing alleged difficulties in reviewing the voluminous discovery they have received from the

Government. *See* Text Minute Entry for 9/9/2026. Specifically, Watts has alleged that her review of materials had been limited to approximately two-hour sessions, twice per week, and that detention facility personnel routinely deny her daily requests to review discovery materials. Pino-Copete has expressed similar concerns, first claiming that he had been unable to review the Government's latest disclosure from the week prior, but later claiming that he had been unable to review new disclosures since as early as February 2026.[3]

The Government disputes defendants' allegations and, at the Court's request, has obtained documentation from detention facility personnel detailing defendants' ability to access discovery materials in the months leading up to trial. *See* Dkt. Nos. 207-1, 207-2. Upon review of the materials and for the reasons that follow, the Court finds that defendants have failed to demonstrate that an eleventh-hour adjournment of the trial is warranted.

At the outset, the Government's submissions belie many of defendants' allegations. For one, staff at Watts's pretrial detention facility report that Watts "frequently declines" appointments to review discovery. Dkt. No. 207-1 at 2–3. And according to a log maintained by Pino-Copete's facility, Pino-Copete utilized a discovery room for nearly 200 hours between March 26, 2026, and September 8, 2026. Dkt. No. 207-2 at 2–3.

But even taking defendants' uncorroborated allegations as true and assuming that defendants' access to discovery materials has been curtailed in some fashion by their pre-trial detention facilities, defendants have still failed to demonstrate that an adjournment is warranted. The available record reflects that the Court has responded to defendants' concerns and worked vigorously to ensure that defendants have had sufficient opportunity to review discovery materials in advance of the trial.

---

[3] As the Government has pointed out, Pino-Copete has not previously reported any issues with accessing discovery, including at the June 29, 2026, status conference. *See generally*, Text Minute Entry for 6/29/2026.

Defendants have consistently spurned the Court's efforts. The Court has appointed standby counsel to assist defendants in the preparation of their case. Dkt. Nos. 31, 111. When Watts requested to meet with Pino-Copete, *see* Dkt. No. 162, the Court arranged for defendants and their respective standby counsel to meet privately and confer over discovery using the Court kiosks at their pre-trial detention facilities, Dkt. No. 184. Thereafter, Watts complained that the videoconferencing platform did not allow defendants to review discovery. Dkt. No. 190. At the final pre-trial conference, the Court inquired as to whether the videoconferencing platform permitted screen-sharing, and standby counsel for Pino-Copete advised the Court that he had offered to share his screen so that defendants could review discovery, but that defendants declined and appeared uninterested in reviewing discovery. *See* Text Minute Entry for 9/9/2026. Nevertheless, the Court, again, asked each defendant if they would be interested in participating in another video conference prior to trial. *Id.* Both declined. *Id.*

Upon learning of defendants' complaints, the Court took a three-hour recess in the middle of the final pre-trial conference so that defendants could independently review discovery materials with their standby counsel. *See* Text Minute Entry for 9/9/2026. The goal of the recess was for defendants to ascertain how much additional time they needed to review discovery, but when the pre-trial conference resumed, Watts informed the Court that she had not reviewed any discovery materials during the recess, and that she had, instead, spent that time conferring with her co-defendant about trial strategy. *Id.*

In addition to the measures undertaken by the Court, the Government has likewise offered a host of solutions to facilitate defendants' access to discovery, including offering to arrange visits to the local federal courthouse to review materials. Dkt. No. 60. As to Watts's earlier complaints regarding discovery access, *see* Dkt. Nos. 91, the Government has represented that it has

"repeatedly produced and re-produced discovery to [Watts] upon request, has agreed to work with standby counsel, has offered to do a reverse proffer, . . . and has liaised with the [detention facility] to ensure that the defendant has access to computers to review the provided discovery," Dkt. No. 102 at 9. And at the final pretrial conference, the Government produced two laptops and two hard drives containing all previously disclosed discovery materials for defendants to review with their standby counsel. *See* Text Minute Entry for 9/9/2026; Dkt. No. 189 at 1.

Notwithstanding these collective efforts, defendants argue that they are constitutionally entitled to greater (essentially, unlimited) access to discovery materials so that they can adequately represent themselves. But courts in this Circuit have routinely rejected similar arguments, noting that, "[a]part from the right, in and of itself, to conduct one's own defense, a criminal defendant's decision to proceed *pro se* does not create new underlying protections." *United States v. Schulte*, 2021 WL 4784306, at *2 (S.D.N.Y. Oct. 12, 2021); *see also United States v. Myrick*, 2026 WL 263003, at *1–4 (W.D.N.Y. Feb. 2, 2026) (finding that the Sixth Amendment did not entitle detained *pro se* defendant to "the comprehensive, detailed, specific relief" including unfettered access to discovery materials, a non-recorded telephone line, a laptop, and a printer); *United States v. Helbrans*, 2021 WL 4778525, at *15 (S.D.N.Y. Oct. 12, 2021) (rejecting detained *pro se* defendants' arguments that they were denied constitutionally-required resources where the court appointed standby counsel, ensured that defendants had access to computers, and "ordered the Government and standby counsel to coordinate with the [defendants' detention facility] to ensure that [defendants] received access to the discovery produced in this matter").

In sum, the resources that defendants have received have far surpassed what is required under the Constitution, and the record reflects that defendants have had routine access (which they have sometimes refused) to discovery materials at their respective detention facilities. Therefore,

the Court denies defendants' last-minute request to adjourn the firm trial date of September 14, 2026.

Even so, the Court appreciates the challenges that detained *pro se* defendants may sometimes encounter when preparing for trial. Accordingly, out of an abundance of caution, the Court ordered that defendants be produced to the Syracuse courthouse on Thursday September 10, 2026, and on Friday September 11, 2026, from 9:30 a.m.–4:30 p.m., so that they may further review discovery utilizing the laptops and hard drives provided by the Government.

## IV. CONCLUSION

In sum, the Court's provision of private, virtual meetings between Watts, Pino-Copete, and their respective standby counsel protects their constitutional rights, permits them to efficiently review voluminous discovery, and, if they should desire to do so, provides them with meaningful opportunities prepare a joint defense. Additionally, the available record reflects that defendants have had sufficient time and ample opportunity to review discovery materials and prepare for trial.

Therefore, it is ORDERED that:

1. Watts's renewed letter request (Dkt. No. 190) seeking regular, unsupervised, in-person meetings with her co-defendant is DENIED;
2. Defendants' request for an adjournment of the trial is DENIED; and
3. The U.S. Marshal Service is directed to transport defendants to the Syracuse courthouse on Thursday September 10, 2026, and Friday September 11, 2026, from 9:30 a.m.–4:30 p.m., so that they may review discovery utilizing laptops and hard drives to be made available by the Government.

IT IS SO ORDERED.

Dated: September 11, 2026

Utica, New York.

Anthony J. Brindisi
U.S. District Judge